50 CCPA
**Application of Ralph W. YOCUM.**
**Patent Appeal No. 6867.**

United States Court of Customs
and Patent Appeals.
March 13, 1963.

Chas. M. Fryer, San Francisco, Cal., James W. Dent and Donald J. Rich, Washington, D. C., for appellant.

Clarence W. Moore, Washington, D. C. (Jere W. Sears, Washington, D. C., of counsel) for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

WORLEY, Chief Judge.

This appeal is from the decision of the Board of Appeals of the United States Patent Office affirming the Primary Examiner's rejection of claims 1 through 10, all of the claims in appellant's application for a patent for Tapered End Stud.[1]

Claims 1 and 8 are representative and read:

"1. A straight-threaded stud having uninterrupted threads for use in a tapped hole in which the innermost threads are formed by a tap with a tapered lead end, said stud having its end threads tapered to mate with said innermost threads.

"8. The combination which comprises a member of solid substantially non-expandable structure having a tapped hole therein, a second member to be secured to the first member and having a plain through hole for alignment with said tapped hole, a solid stud-like member threaded on both ends with the threads on a first end being uninterrupted and fitting said tapped hole, a nut to fit the opposite end of said stud-like member to secure the second member tightly against the first member, the threads in said tapped hole being straight throughout the greater part of the length and tapered only adjacent its inner end where the roots of the threads follow the contour of a truncated cone, the stud-like member having straight threads throughout most of its length on its said first end and being tapered only adjacent its end providing the crests of the threads with a complementary frusto-conical contour, and the angle of

said tapers being such as to provide a wedging action which limits the depth to which the stud-like member can be threaded into the tapped hole."

The references of record are:

Thatcher et al. 2,021,704 November 19, 1935.
Janata 2,094,491 September 28, 1937.
Batchelder 2,421,181 May 27, 1947
Flogaus 2,470,924 May 24, 1949.

The claims relate to a threaded stud having a tapered lead end, and to the combination of the stud, defined as having a nut on the other end, with two members, one of which has a tapped hole, secured together thereby.

Appellant states that commercially available taps used in tapping or threading holes are provided with a conventional chamfer or taper at the lead or entry end. That construction results in the bottom of the tapped hole having imperfect threads which correspond to the taper of the tap. According to his invention, the lead end of the stud to be threaded into the tapped hole is provided with a taper, formed either before or after the threads are formed. The taper on the stud has the same angle as the taper of the tap, resulting in the incomplete threads on the stud mating with the flat root portions of the threads at the inner portion of the tapped hole when the stud is fully seated to provide a wedging action. Such construction is said to result in high torque being required to break the fully seated stud loose from the tapered portion of the tapped hole while little turning effort is subsequently required to complete removal of the stud.

Appellant discloses an assembly wherein the stud extends through an oversized unthreaded hole in a second member into the tapped first or base member and has a nut threaded on its projecting untapered end to secure the two members together.

The Flogaus patent discloses a construction wherein a metallic anchor nut

1. Serial No. 456,570, filed September 16, 1954.

is embedded in a hole in a panel of wood, soft metal member or the like. The nut is adopted to receive an expander screw or bolt which is passed through an oversize hole in a second member to secure the two members together. The screw, which has an integral head at one end, has straight uniform threads along the shaft except at its lead end where the threads are flattened to produce a tapered extremity. The anchor nut is in the form of an internally threaded shank of soft metal slotted at the inner or lead end to provide expansible prongs having external barbs. The tapered end of the expander screw has a shape similar to that of the lead end of the tap used for cutting the internal threads on the anchor nut. The threads on the screw are designed to match the internal threads of the anchor nut. When the screw is threaded into fully seated position in the anchor nut, the final turns force the end of the screw into a tapered and unthreaded inner portion of the nut, cutting threads there through, as well as causing the external barbs on the nut to bite into the panel member, thereby securing the nut in place. The screw is held against dislodgment due to vibration by reason of the engagement resulting between the threaded lead end of the expander screw and the surrounding imperfect threads. However, the screw may be "withdrawn and re-applied to the anchor nut repeatedly without impairing its effectiveness."

The Batchelder patent discloses a stud bolt which has tapered threads on its stud end. The tapered end is received in a similarly shaped and threaded recess in a stud receiving element. An assembly is shown wherein the stud bolt passes through an oversized hole in a second element and a nut serves to secure the two elements together.

The Janata patent relates to screw threaded joints for pipes and rods. One disclosed structure includes a male member having a straight thread portion extending to the end of the structure at which location that portion is tapered. Threads on the opposite side of the straight portion from the end depart from a regular straight thread construction.

The Thatcher et al. patent discloses a self-tapping screw which cuts its own threads in unthreaded holes in sheet metal and like materials. Each of approximately three threads at the lead end are flattened at an acute angle to the axis of the screw but each of the threads is of the same size as the other two. The end thus is of reduced diameter relative to the main threads but is not itself tapered.

The examiner rejected all claims as unpatentable over Flogaus, holding that the term "stud" does not distinguish patentably over that reference for two reasons. First, he concluded, on the basis of a dictionary definition,[2] that the term "stud" is not limited to a headless member having threads on both ends and that the screw in Flogaus "could be used in a manner to be termed a 'stud.'" Additionally, he took the position that forming the screw in Flogaus as a headless member and applying a nut thereto would involve merely a standard mechanical organization. Other limitations in the claims were not regarded by the examiner as defining over Flogaus.

The examiner also rejected claims 1 through 10 on Batchelder in view of Flogaus or Janata, and claims 7 through 10 on Thatcher et al.

In affirming the examiner's action, the board specifically discussed only the rejections on Flogaus and on Batchelder in view of Flogaus.

With reference to claims 1 through 7, the board regarded the term "stud" as broader than "stud bolt" and as applicable to the bolt or screw of Flogaus. It

---

2. Webster's New International Dictionary, Second Edition, includes the following definitions of the noun "stud."

   2. A projecting knob, rod, pin or the like; esp., a kind of a nail with a large head * * *.

   11. Mach. a. A short rod or pin, fixed in and projecting from something, and sometimes forming a journal; also, a short live spindle or mandrel, as in the change gear for a screw cutting lathe. b. A stud bolt.

noted that claims 8 through 10 specify that a separate nut is threaded on the end of the stud but took the position that use of a separate end nut, as shown in Batchelder, instead of a bolt head of Flogaus, amounts only to a matter of unpatentable choice. In connection with the rejection on Batchelder in view of Flogaus, the board held it would be obvious to one skilled in the art to replace the tapered threads on one end of the stud bolt of Batchelder with the tapered threads used on the screw of Flogaus, observing that the threads on the stud receiving element would necessarily be modified to accommodate the modified threads.

Appellant directs attention to definitions found in several technical dictionaries and handbooks in support of the contention that the term "stud" has a definite and fixed meaning which he sets out as a "headless threaded solid cylinder." He also refers to the fact that the specification uses the word "stud" approximately fifty times without a single reference to a screw, bolt, or other fastener. The definitions indicate clearly that the art recognizes a definition of "stud" which does not include the headed screw of Flogaus. It seems to us that the word is used in that restricted sense in the application and we think it should be so interpreted in the claims.

However, the rejection on Flogaus is not disposed of by acceptance of appellant's definition of "stud." There still remains the question whether it would be obvious to a person of ordinary skill in the art to eliminate the head of the Flogaus screw and substitute therefor a threaded end and a nut.

Appellant takes the position that Flogaus does not provide the results attained by the recited structure, urging that the reference structure fails to provide "a wedging action which gives rise to a high quality force fit." According to appellant, the effectiveness of the Flogaus construction is dependent on the existence of the screw head.

We are unable to agree with appellant that the modification in question is unobvious. Although threads are cut in the anchor nut of Flogaus when the screw is first threaded to its fully seated position, that reference discloses that the prongs of the nut exert a force which, together with the engagement provided between the screw and the surrounding imperfect threads, causes the screw to be gripped firmly as it is threaded into the anchor nut. It is further disclosed that the screw "is thus held against dislodgment due to vibration, but it may nevertheless be withdrawn and re-applied to the anchor nut repeatedly without impairing its effectiveness." Thus, Flogaus does not indicate that engagement of the screw head with the held member is necessary for retention of his screw. The description fully supports the conclusion reached by the board that, upon re-application of the screw after withdrawal, there will be a wedging action between the mated tapered thread portions. Under the circumstances, we are convinced that it would be obvious to a mechanic of ordinary skill to employ a nut and threaded extension on the Flogaus screw for the purpose of utilizing the well-known inherent advantage of being able to adjust the position of the nut independently of the threads that engage the base member. Such feature would obviously be desirable to permit obtaining a tight assembly where the thickness of members which it is desired to secure to tapped base members might be subject to variation in the thickness or where it might become necessary to replace the held plate with a replacement of slightly different thickness. Since we think claims 1 through 7 and 10 would cover the Flogaus structure modified in that obvious manner, the rejection of those claims on Flogaus will be sustained.

Another issue arises with respect to claims 8 and 9, however. Both define the member having the tapped hole as of "solid substantially non-expandable structure." We are unable to agree with the board that the quoted term "has fair response in" the panel and anchor nut of Flogaus when the nut is in seated position. The prongs of the anchor nut are

designated as "expansible" and the screw is referred to as an "expander" for that nut. Even though the Flogaus drawing shows the barbs on the outer side of the prongs embedded deeply in the surrounding panel portion after the screw is seated, there is no assurance that the structure even then is "substantially non-expandable." Although the tapered positions of the male and female threads provide a wedging action in Flogaus, it seems to us that Flogaus does not suggest that use of a non-expandable female member with his thread configuration will result in the superior holding properties attained by appellant. The rejection of claims 8 and 9 on Flogaus will, therefore, not be sustained.

We also consider the rejection of claims 8 and 9 on Batchelder in view of Flogaus or Janata to be in error. Batchelder uses full tapered threads on the mating surfaces rather than straight threads with the crests tapered. We find no suggestion in Flogaus of any reason why the thread structure which he employs with an expandable anchor nut assembly might be substituted in the Batchelder assembly with its tapped hole formed in non-expandable material. Further, it is not seen that Janata, which relates to the solution of a problem associated with pipe or rod joints and includes a thread portion which is not straight, would provide any suggestion that Batchelder be modified to provide the claimed structure.

The rejection of claims 8 and 9 on Thatcher et al. likewise cannot be sustained. As pointed out by appellant, the self-tapping screw of that patent includes straight end threads as a major feature. Although the patent shows the end threads, approximately three in number, to be of smaller diameter than the remainder of the screw, those threads are all of the same diameter with the result that the frusto-conical contour recited in the claims is lacking. Further, there is no indication that the hole to which the screw is applied will have the same configuration as the end of the screw.

For the reasons given, the decision of the board is *affirmed* as to claims 1 through 7 and 10, but *reversed* as to claims 8 and 9.

Modified.